# CRIMINAL COURT OF BALTIMORE CITY.

Filed July 9, 1923.

STATE OF MARYLAND
VS.
ALLEN B. LOCKART, R. TYNES SMITH, JR., R. EARL THOMAS AND HERMAN ZEUSLER.

*Robert F. Leach, Jr.,* State's Attorney, and *Gaylord Lee Clark,* Assistant State's Attorney, for the State of Maryland.

*Robert R. Carman* for R. Tynes Smith, Jr., *Harry W. Nice* for H. Zeusler, *George W. Lindsay* for R. Earl Thomas, *William Curran* for A. B. Lockhart, *William L. Marbury* and *Milton Roberts,* general counsel.

STEIN, J.—

I think it proper to give the reasons upon which the sentences of these traversers are based.

They are four of the five members of the late firm of Smith, Lockhart & Company, which carried on a large stock brokerage business in this City of Baltimore from August 1st, 1920, to August 9th, 1922; when they were adjudicated bankrupts; the adjudication following the removal from their offices of the New York Stock Exchange tickers.

On August 1st, 1920, the firm took over the stock brokerage business, which since July, 1911, had been carried on by the traversers, Smith and Lockhart, as a partnership, until 1915; then by Smith, Lockhart & Company, Inc., a corporation; in which, they were the managing executives, as well as owners of almost if not all the common stock, in which corporation, the other traversers, Zeusler and Thomas, were employees; the change from corporate to firm organization was the result of a rule denying the privileges of the Baltimore Stock Exchange to corporations, their officers or employees, which rule was directed at all corporations, not at any particular one.

The corporation and successor firm specialized in the sale of stocks and bonds on the partial payment plan, under which the buyer made an initial payment on account and monthly payments thereafter; the initial payment varying with the price of the stock or bond bought; the important and attractive feature of this plan to the buyer was the firm's contract in writing, that in consideration of an extra commission (called in that contract an insurance) of eighty-five cents for each hundred dollars of the purchase, the buyer could not be compelled to make the usual marginal payments, when the market price of the stock or bond bought, became lower than the contract price; so that the buyer knew that after the initial payment his only other payments would be the monthly partial payments named in and fixed by his contract. Eighty per cent. of the business of the traversers' firm was done on this partial payment plan; the remaining twenty per cent. was made up largely of the usual marginal transactions. Of the traversers, Lockhart was an experienced stock broker, having been in the stock brokerage business for many years; was the dominant and forceful factor in the corporation and in the traversers' firm: Smith was a mechanical engineer, without experience in the stock brokerage business, until 1911, when he and Lockhart formed a partnership, which was succeeded by the above named corporation, called Smith, Lockhart & Company, Inc., which, in turn, was succeeded by the firm of which the traversers were members. Thomas was a bookkeeper or accountant with the corporation and with the firm; Zeusler started out with the corporation as a board boy, later became an inside salesmen. The traversers are intelligent men, well-informed, well educated and

alive to their responsibilities and duties to their customers.

When the traversers' firm was formed in August, 1920, to take over the Smith, Lockhart & Company, corporation, none of the parties contributed any capital; the corporation was insolvent, at least, to the extent of $240,444.58; the corporate assets included a debt due by Lockhart on a speculative account which then was $130,000, more than the value of the collateral, and which two years thereafter, i. e., on August 9th, 1922, the date of the bankruptcy, had increased to $189,497.79 more than the value of the collateral; such corporate assets also included a debt Smith owed the corporation of $57,000, more than the value of the collateral, which debt on the day before the bankruptcy Smith paid and had a credit on the firm books. These debts resulted from losses on speculative marginal account with the corporation. Lockhart's debt and resultant loss to the firm was not paid at the bankruptcy. By far the greater part of the business of the corporation and of the succeeding firm, was on New York Exchange, consisted of the purchase on margin of stocks and bonds for partial payment as well as marginal customers. When the firm was formed the loss above named of $240,-000 had grown out of sales by the New York correspondents of the stock and bonds necessary to make good New York marginal demands, caused by falling market prices; the loss meant that when the traversers' firm was formed and took over the corporate business, it needed about $240,000 to repurchase stocks and bonds, the corporation had bought on orders for its customers mostly "partial payment" and which it had sold to make good marginal losses; all which was shown by the books of the corporation, with which these traversers were connected, Lockhart and Smith as executive officers, Thomas and Zeusler as employees.

The testimony on behalf of the traversers shows, that in October, 1920, this loss of $240,000 apparently was wiped out by a short rise in market quotations, so great in extent that on all the stocks and bonds the firm had bought for its customers it amounted to more than $1,000,000; but which rise in price could not profit the firm, as they had bought such stocks and bonds for customers at named prices; any increase in price belonged to the customers and not to the firm. This rise was temporary, the market soon declined and so continued to do, until on the day of the failure, the firm losses at then market prices were at least two and one-half million dollars more than its assets.

The undisputed evidence shows that knowing their firm was insolvent, that its insolvency was rapidly increasing, the traversers not only continued business, but accepted money on its old partial payment contracts; made many other new and like contracts, and used the moneys coming in therefrom to pay losses on its old contracts.

This is a short history of the life of the firm. The testimony on behalf of the traversers shows:

(1) That after October 1, 1920, the New York correspondent made almost daily calls for margin, to meet which it soon became necessary to sell some of the stocks and bonds the firm carried in New York on margin, so that the firm ordered sold large quantities of the various stocks and bonds it had bought for its customers; selling those of its partial payment customers, as well as of its marginal customers, in spite of the fact that the written contracts with its partial payment customers contained a promise that buyers on the partial payment plan would not be required to make marginal payments.

(2) That in all cases in which sales were made of stocks and bonds bought for partial payment customers, thereafter, the firm regularly sent out statements to them showing no sale had been made of any of the stocks or bonds so bought, and in addition charged such customers with interest on the balance due; thereby requiring the customer to pay interest on moneys not owing.

(3) That where such sales had been made of dividend paying stocks or interest producing bonds; as the dividends and interest thereon became payable, the firm either by a credit or by sending a check accounted therefor to the partial payment customers for whom such stocks and bonds had been bought, even though the firm's books would show that such stocks or bonds had been sold; all of which was intended to and kept from the customers the truth, i. e., that the firm had sold and did not have the stocks and bonds

bought for and charged to the customer. The firm kept a separate book in which such credits or payments of dividend and interest were entered. The moneys so paid the customers as interest or dividends were taken out of its general funds and was made up of moneys paid to the firm by customers, either as brokerage or so-called insurance, or account of partial payments; the sum so paid or credited by the firm as dividends or interest from January 1st, to August 9th, 1922, the day of the failure amounted to $124,398.51, more than $15,000 per month.

(4) The testimony also shows that in many cases stocks and bonds left for safe keeping, upon which the firm had no claim, were first hypothecated to meet firm marginal requirements, and then sold by the New York correspondent in default of marginal payments; all to the loss of the buying customer. This happened in a number of cases, of which the following are typical:

(A) A customer bought and paid in full for stock to the amount of $4,000, and, as he intended to sell on a quick profit, did not have the stock delivered to him, but allowed the firm to retain it for safe keeping; notwithstanding which the firm sold the stock to meet the marginal requirements of their New York correspondent, and the customer never got a share of the stock.

(B) In another case, a woman stenographer bought one share of stock which cost the firm about $85, for which she agreed to pay $100; not having the money to pay therefor, as security gave a bond, which the firm at once hypothecated for $500, without either paying for the stock or delivering it to her, so that the buyer not only did not get her share of stock, for which she paid, but to get back her bond is called on to pay $500.

(C) In another case, a customer ordered the firm to buy on the partial payment plan a number of shares of stock at a price then below the market; gave as collateral certain other shares of stock in his possession, fully paid for. The order to buy and delivery of the collateral took place on a Saturday about 11.30 A. M.; before the closing of the Stock Exchange at noon on that day the firm sold the stock deposited as collateral and did not then and never since bought the stock ordered, because up to the time of the failure the market price therefor never got as low as the price at which it was ordered to be bought.

(D) In another case, a former partial payment customer in June, 1921, left with the firm for safe keeping 30 shares of different kinds of stock, fully paid for, valued at $2,237.56, and upon which the firm had no claim, all of which the firm had sold to meet its marginal requirements, the customer never getting back any of the stock.

(E) In many other cases old partial payment customers made new purchases on the partial payment plan, left as collateral for such new purchases all the stock and securities formerly bought on the same plan, all of which, i. e., the old stock and securities and the new purchases were sold by the firm to meet its New York marginal calls.

(5) At the failure the firm owed its customers about one hundred and eighty thousand shares of various kinds of stock and had on hand only fifty-seven thousand and fifty-six shares, having sold to meet its marginal demands 122,944 shares, leaving only 57,056 shares to meet its obligation to deliver the 180,000 shares to its customers. At that time the firm owed its customers bonds to the par value of $1,273,400, and had on hand bonds to the par value of $573,650, being short of bonds it had bought for its customers bonds to the par value of $699,750. This shows the extent to which the firm's insolvency compelled it to sacrifice its customers, eighty per cent. of whom had bought on the partial payment plan, and under their contracts could not be called upon for margin.

The firm had more than two thousand customers; about seventy of whom testified for the State; all who testified, save a few, were either working or salaried people, each of whom paid the monthly installments out of their earnings; many who did not have the cash to make the initial payment, hypothecated other stocks or bonds either wholly or partially paid for. The firm to meet its marginal requirements, sold more than two-thirds of the stock bought and hypothecated by its customers, although its partial payment customers not only were not in default, but held the firm's contract not to demand any margin.

The traverser Smith on the day before the failure paid the balance he owed the firm. Lockhart never paid

the amount he owed. Neither he nor Smith, since August 1, 1920, paid any margin in answer to the margin calls from New York, but allowed such margin to be fed, either by the excess margin furnished by customers' stocks and bonds or by their sale.

In justification the traversers claim:

(a) That their partial payment contract gave them the right to sell or hypothecate the stocks and bonds bought for or pledged by their customers, marginal as well as partial payment.

(b) That if the firm had been allowed to go on it eventually would have paid out in full, as the brokerage earnings were large, and at some future time the market would have so risen that out of the increased value sufficient margin could have been realized to purchase the stocks and securities of which the firm was short.

(c) That they only did what other reputable brokers do.

(d) That the New York Stock Exchange ordered out their tickers in a nation-wide drive to put partial payment houses out of business.

Taking up these defenses, we find:

(a) That it is not necessary to determine the firm's rights under their partial payment contracts, because the contracts certainly (1) did not give the right to sell stock and bonds fully paid for and left with the firm for safekeeping; (2) did not justify the hypothecation and sale of stocks or bonds deposited as collateral for a purchase never made; (3) did not justify the hypothecation or sale of stock paid in full, never delivered, but merely allowed to remain in the custody of the firm for future sale.

(b) As to the second, the record which shows in two years an increase in loss of from an initial insolvency of about $240,000 to a final insolvency of more than $2,500,000, which, at least, is persuasive of the result of a continuance of the business, which, even if successful, could not justify either (1) the improper use of the customers' stocks and bonds; or (2) the taking of money from new customers; or (3) the receiving moneys from old customers, while the firm's insolvency, to the knowledge of its members, was increasing at the rate of ten times in two years. i. e., from $240,000 to $2,500,000. The rise in value of the stocks and bonds belonged to the customers; it could not properly have been used as a margin to replace the stocks and bonds sold.

(c) As to the third: I do not believe reputable stock brokers of this city do business in the manner these traversers did. If they do, it does not excuse the traversers.

(d) As to the fourth defence: While no evidence was allowed on this point, it was first touched upon in the opening statements of the traversers' counsel, thereafter throughout the trial was adverted to in various other ways. It is quoted here merely to show that in fixing the sentences I have taken into consideration everything the traversers urged in their defense. If the New York Stock Exchange ordered out the stock tickers for the reasons stated, this case shows that a firm doing a business, dealing with other people's money in the manner the firm of these traversers did, were not entitled and should not have had the use of any instrumentality necessary to continue such business.

The trial in this case lasted nearly three weeks; the traversers were represented by some of the ablest lawyers at the bar, who defended their clients with even more than their usual great skill and ability. The jury, capable and unusually interested and attentive, in a trial that lasted so long and contained much that was uninteresting, after a session of nearly twenty-four hours found the traversers guilty, and recommended them to the mercy of the Court. To find out what that recommendation meant, I had two interviews with the jurors, one immediately after the verdict, the other a week following, in each of which a full discussion was had. The jurors told me their views of what the sentences should be, and what the recommendation of mercy meant, since which time many letters from the friends of the traversers asking clemency have been received and considered, in almost all of which the writers, although they did not hear the testimony, and in spite of the verdict of the jury, expressed confidence in the innocence of the traversers.

The traversers occupied a high position in financial and social life in this city; their firm, until its failure, was well rated and stood high. Its partial payment customers, as a class, were people of small affairs, working on

small or moderate salaries, attempting to better their condition, who denied themselves to buy, on this plan, stocks and bonds they thought safe and likely to rise in value; they dealt with the traversers' firm because of their faith in its integrity and honesty. By the traversers' conduct these people have had swept from them the savings of months, in some cases of years; have lost not only the fruits of their labor and savings, but must have lost that faith in the integrity of our brokerage houses which every citizen should have, and which loss is harder to repair than a money loss. While the jurors were of the opinion that the traversers were guilty, yet in their conferences with me said they did not think the degree of guilt of each traverser was the same; that they thought the traverser Lockhart was the dominating spirit, and the most experienced of all the traversers, and therefore should receive a greater sentence than the other travarsers; they thought the traverser Smith was largely influenced by Lockhart and not as culpable as he, but more culpable than either Thomas or Zeusler, and should receive a lesser sentence than Lockhart; that they thought because of the domination of Lockhart, their confidence in his skill and experience, their subordinate positions in the firm, and their youth, they should be dealt with more leniently than either Smith or Lockhart. In this view they were strengthened by the closing argument of the learned State's Attorney, who in it said that, if found guilty, the judge could parole these two men.

While in sentencing these traversers I am guided by the jurors' views and recommendations, I feel that the domination or command of a superior should excuse wrongdoing only in those few cases in which, because of extreme age, youth, inexperience or disease, there is not enough mind to resist and to know right from wrong. In this case each traverser played a part, in what from the evidence the jury rightfully found, and could only have found, was a conspiracy to defraud. This conspiracy resulted in great loss to many innocent and confiding people. That the traversers should be punished therefor is proper; that in so doing innocent members of their families will suffer, is regrettable but unavoidable. Sympathy for the innocent should not lessen punishment for the guilty.